**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

ERIC GOLDSTEIN
BLAINE ILER,
MICHAEL TURLEY, and
BRIAN TWOMEY

Defendants.

Case No. 1:21-cr-00550 (SJ)

# SENTENCING MEMORANDUM OF MICHAEL TURLEY

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

I. OFFENSE CONDUCT ........................................................................................ 2

II. MICHAEL TURLEY'S CHARACTER AND HIS INDISPENSABLE ROLE IN THE LIVES OF [redacted] AND ALEX TURLEY ........................................ 2

A. Mr. Turley's Professional Commitment to Healthy Food and Fighting Childhood Food Insecurity Is Integral to His Character ........................................ 2

B. Mr. Turley's Defining Trait Is His Devotion as a Father ........................................ 7

C. Mr. Turley's Steadfast Perseverance in the Face of Countless Collateral Consequences ........................................................................................ 9

III. APPROPRIATE SENTENCE ........................................................................ 12

A. The Court Should Depart From the Guidelines Range Because It Overstates the Seriousness of the Offense and Because Mr. Turley Has No Prior Criminal History. ........................................................................................ 13

B. A Probationary Sentence Is Supported by the § 3553(a) Factors and Serves the Purposes of Sentencing ........................................................................ 14

1. Mr. Turley's history and characteristics. ........................................................ 14

2. The public is not at risk of further crimes by Mr. Turley. ........................................ 17

3. Mr. Turley has already suffered substantial punishment. ........................................ 19

4. The need to avoid unwarranted disparities under § 3553(a)(6) ........................................ 20

5. A sentence of probation is sufficient to reflect the seriousness of the offense and provide just punishment to Mr. Turley as an individual. ........................................ 20

CONCLUSION ........................................................................................................ 21

## TABLE OF AUTHORITIES

**CASES**

*Dorsey v. United States*, 567 U.S. 260 (2012) ........ 13

*Gall v. United* States, 552 U.S. 38 (2007) ........ 12

*Nelson v. United States*, 555 U.S. 350 (2009) ........ 12

*Pepper v. United States*, 562 U.S. 476 488 (2011) ........ 12, 21

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........ 17

*United States v. Aguilar*, 133 F. Supp. 3d 468 (E.D.N.Y. 2015) ........ 15

*United States v. Booker*, 543 U.S. 220 (2005) ........ 1, 12

*United States v. Carmona-Rodriquez*, No. 04 Cr. 667RWS, 2005 WL 840464, at *5 (S.D.N.Y. Apr. 11, 2005) ........ 18

*United States v. Davis*, No. 07 CR. 727 (HB), 2008 WL 2329290, at *6 (S.D.N.Y. June 5, 2008) ........ 15

*United States v. G.L.*, 305 F.R.D. 47 (E.D.N.Y. 2015) ........ 15, 16, 17

*United States v. Gaind,* 829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ........ 20

*United States v. Hawkins*, 380 F. Supp. 2d 143 (E.D.N.Y. 2005), *aff'd*, 228 Fed. Appx. 107 (2d Cir. 2007) ........ 16

*United States v. Jenkins,* 854 F.3d 181 (2d Cir. 2017) ........ 19

*United States v. Nesbeth,* 188 F. Supp. 3d 179 (E.D.N.Y. 2016) ........ 19

*United States v. Paredes*, No. 15-CR-582 (WFK), 2023 WL 8096922, at *6 (E.D.N.Y. Nov. 21, 2023) ........ 14

*United States v. Rioux*, United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) ........ 16

*United States v. Ruiz*, No. 04CR.1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ........ 18

*Williams v. People of N.Y.,* 337 U.S. 241 (1949) ........ 17

## STATUTES

18 U.S.C. § 3553(a) ........................................................................... 1, 12, 13, 14, 21

18 U.S.C. § 3553(a)(1)........................................................................................ 13

18 U.S.C. § 3553(a)(2).................................................................................... 12, 14

18 U.S.C. § 3553(a)(3)........................................................................................ 13

18 U.S.C. § 3553(a)(4)........................................................................................ 13

18 U.S.C. § 3553(a)(6)........................................................................................ 20

18 U.S.C. § 3553(a)(7)........................................................................................ 13

## OTHER AUTHORITIES

88 Fed. Reg. 28254 (May 3, 2023) ...................................................................... 13

*Alliance for a Healthier Generation and Tyson Foods Team Up to Improve Nutrition of School Meals for Millions of American Students*, Tyson Foods, Inc. via GlobeNewswire, (Apr. 4, 2013), https://www.globenewswire.com/news-release/2013/04/04/535911/10027276/en/Alliance-for-a-Healthier-Generation-and-Tyson-Foods-Team-Up-to-Improve-Nutrition-of-School-Meals-for-Millions-of-American-Students.html ................................................................................................ 4

Kalina M. Brabeck, M. Brinton Lykes & Cristina Hunter, *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. of Orthopsychiatry 496, 500 (2014)........................................................ 15

Michal Gilad, *The Young and the Helpless: Re–Defining the Term "Child Victim of Crime,"* 32 (U. Penn. Law School, Public Law Research Paper No. 14–23 (2014)............................................................................... 15

Shirley R. Klein *et al., Inmate Family Functioning,* 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99–100 (2002) ................................................................ 18

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf............................................. 18

U.S. Sent'g Comm'n, *Older Offenders in the Federal System* (July 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf............................................................. 18

U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* (Sept. 30, 2021), https://www.ussc.gov/research/ research-reports/recidivism-federaloffenders-released-2010 .......... 13

U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (Mar. 9, 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf .......... 17, 18

U.S.S.G. § 4C1.1 .......... 13, 14

U.S.S.G. § 5C1.1 .......... 13

Michael Turley, by his undersigned attorneys, respectfully submits this Sentencing Memorandum and the attached exhibits to assist the Court in fashioning a sentence "sufficient, but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005).

## INTRODUCTION

Michael Turley is a man of high character whose conviction stands in stark contrast to everything he has achieved and the values he has consistently demonstrated over the course of his life. Mr. Turley devoted his professional life to bringing healthy meals to school cafeterias—the same kind of food he wanted his own children to eat. After a decade of establishing himself as an expert in this field at the top food suppliers in the country, Mr. Turley wanted to make more meaningful change and bring innovation to school food. He, Blaine Iler, and Brian Twomey partnered on the startup company that attempted to do just that. The three men founded Somma Food Group in 2015, with a mission to do well by doing good. Mr. Turley's professional interests are deeply connected to his children. Mr. Turley is a loving and devoted father to his 9-year-old daughter, [redacted], and his 25-year-old son, Alex. Mr. Turley's dedication to his children is his defining trait, as is outlined in the character letters attached to this submission.

Mr. Turley respects the jury's verdict, and while he continues to believe that the verdict was wrong, he is remorseful for his lapses in judgment in going into business with a government employee whose agency was also a customer. Although he has yet to be sentenced, Mr. Turley has already paid an enormous price. He has lost his marriage, much of his time with his daughter, his home, his profession, and his reputation. Mr. Turley is not a danger to society and poses no risk of recidivism. To the contrary, he has consistently made positive contributions to his community throughout his life. Mr. Turley respectfully submits that a probationary sentence, or, in the alternative, a period of home detention, would best serve the goals of sentencing.

## I. OFFENSE CONDUCT

In the interest of efficiency and conserving judicial resources, Mr. Turley incorporates by reference the description of the offense conduct set forth in the Defendants' joint submission, ECF No. 201, and Brian Twomey's sentencing submission, ECF No. 202, Section III.B–C.

## II. MICHAEL TURLEY'S CHARACTER AND HIS INDISPENSABLE ROLE IN THE LIVES OF [redacted] AND ALEX TURLEY

### A. Mr. Turley's Professional Commitment to Healthy Food and Fighting Childhood Food Insecurity Is Integral to His Character

Mr. Turley has devoted much of his career, and life, to feeding hungry children. With nearly two decades in the business of providing meals to schoolchildren, Mr. Turley has consistently been a champion for improving the quality and taste of the food served in school cafeterias, the place where many children receive their only full meal of the day.

Mr. Turley's career in school food began at AdvancePierre Foods, then known as Advance Food Company. The CEO of Advance was impressed by Mr. Turley's involvement in the Enid, Oklahoma community, where Mr. Turley served the public through his church, his high school and university, on the boards of the YMCA and YWCA, and other volunteer efforts. In 2003, the CEO approached Mr. Turley and asked him to join Advance, without knowing what specific role he would ask Mr. Turley to play. By 2006, Mr. Turley was the vice president leading Advance's K-12 business. Mr. Turley ran sales and marketing, which included overseeing thousands of bids to K-12 customers. In 2010, Advance merged with Pierre Foods to become AdvancePierre—the largest beef supplier in the K-12 industry. Mr. Turley maintained his position, and, as a result of the merger, gained significantly more customers, including the New York City Department of Education ("NYCDOE"). This is where Mr. Turley first became acquainted with Eric Goldstein.

Starting at Advance, Mr. Turley began developing a strong network within the K-12 industry, through professional organizations, like the School Nutrition Association, and at the U.S.

Department of Agriculture ("USDA"). The USDA's role in school food is fundamental. It sets regulations, funds school food programs, and is a major purchaser of school-food products. In his various roles, Mr. Turley worked closely with USDA officials. He discussed new regulations with them, assisted in the logistics of aligning food delivery schedules with district ordering behaviors, and helped the USDA coordinate a massive beef recall in 2008 relating to mad cow disease.

In 2012, Mr. Turley became the face of the largest supplier in the K-12 business, when Tyson Foods hired him as the Vice President of the Government Business Unit, or the K-12 unit. In this role, Mr. Turley functioned as the senior executive manager of a large and vertically integrated food production and distribution business. He had direct responsibility over the hatchery, contract farms, slaughterhouses, further-processing plants, bid department, customer service, sales, and broker network. In this capacity, he often met with individuals at top school districts, like NYCDOE, to discuss topics like customer needs, new products, and marketing initiatives. Through this work, Mr. Turley and Mr. Goldstein developed their professional relationship.

Mr. Turley had deep respect for Mr. Goldstein and viewed him as a leader and innovator in the school food field. Mr. Turley also believed in the case for change that Mr. Goldstein was making to bring healthier food to schools in New York and to other large districts across the country through the Urban School Food Alliance. Mr. Turley was not successful, however, in persuading Tyson to develop antibiotic-free products. Because of the scale and scope of Tyson's operations, that approach would have required a major investment that the company was unwilling to make—until years later, when the cutting-edge ideas that Mr. Goldstein promoted, and Mr. Turley supported, gained wider acceptance in the industry. After Mr. Turley left Tyson in 2014, he and Mr. Goldstein remained in touch. They sometimes discussed healthy food initiatives Mr.

Goldstein wanted to bring to school food. Mr. Turley was honored that Mr. Goldstein sought his expertise and input, but Mr. Turley did not find anything strange or improper about their conversations given that Mr. Turley was an established expert in the K-12 food industry.

Mr. Turley loved working in this industry, and he immersed himself in it. He pushed his employers to develop innovative products, including antibiotic-free chicken, in order to make food more nutritious, safer, and more appealing for children. Through his work in the industry, he learned about the widespread problem of children's hunger in the United States. He recognized that for many children, the meals they received at school were their only reliable source of food during the week. This instilled in Mr. Turley a sense of duty, and a mission, that extended beyond the commercial objectives that must be taken seriously in any business setting.

Motivated by a calling to fight childhood food insecurity and improve children's health, Mr. Turley engaged in decades of charitable work both in his personal life and in corporate partnership with organizations like No Kid Hungry and Alliance for a Healthier Generation. As an executive at Tyson, he allocated a significant portion of his business unit's marketing budget to help schools in need. One such example is Edward R. Murrow High School in Brooklyn, where he and his team funded a wellness facility for student use. Ex. K, *Alliance for a Healthier Generation and Tyson Foods Team Up to Improve Nutrition of School Meals for Millions of American Students*, Tyson Foods, Inc. via GlobeNewswire, (Apr. 4, 2013), https://www.globenewswire.com/news-release/2013/04/04/535911/10027276/en/Alliance-for-a-Healthier-Generation-and-Tyson-Foods-Team-Up-to-Improve-Nutrition-of-School-Meals-for-Millions-of-American-Students.html. In his leadership role at Tyson, Mr. Turley also changed all team building outings into team service endeavors, such as volunteering in soup kitchens and food banks.

In his personal life, Mr. Turley regularly volunteered making meals at his local Ronald McDonald House. And prior to his indictment and arrest, Mr. Turley was completing the prerequisite training to become a court-appointed special advocate, or CASA, for children who have experienced abuse or neglect. The inspiration for this particular volunteer effort was Mr. Turley's own parents, who served as foster parents when Mr. Turley was a young adult. The importance of community service was ingrained into Mr. Turley from a young age and led to a lifelong commitment to volunteer work of all kinds.

This is no 11th hour conversion cynically embraced to create a more favorable record at sentencing. Mr. Turley's commitment to helping children in need is integral to his values, as reflected in the letter his son Alex wrote on his father's behalf. *See* Ex. B (Alex Turley). In it, Alex attaches the words of wisdom his father gave him upon graduating from high school. *See id.* Mr. Turley gave his son this life advice on April 5, 2017, years before Mr. Turley had any idea of the existence of a criminal investigation. *See id.* Mr. Turley's advice to his teenage son included: "*Treat everyone you meet with kindness, respect, and compassion.*" "*Stick up for the defenseless.*" "*If there is a RIGHT thing, do the right thing, every time.*" *Id.* It also included a lesson unique to Mr. Turley's particular values: "*Make feeding hungry kids a priority.*" *Id.*

It was that commitment to feeding hungry children more nutritious, less processed, and more appealing food that led Mr. Turley to found Somma, along with Brian Twomey and Blaine Iler. Unlike Mr. Twomey and Mr. Iler, who had already built and sold a highly successful business, Mr. Turley was not, and is not, wealthy. The ultimate failure of Somma was a serious financial blow for Mr. Turley, as was the subsequent failure of Zephyr, the food startup Mr. Turley founded afterwards.

Even during the difficult times for his businesses, however, Mr. Turley's moral compass

did not waver. On January 11, 2016, while a SchoolFood employee was trying to unlawfully impose a crippling penalty on Somma, Mr. Turley wrote to his business partners: "I'm going to sleep well tonight for one reason: I work with honest, talented people that just want to do the right thing and win." DX369. This is consistent with a subsequent email to Mr. Goldstein, where Mr. Turley asked: "We respectfully request that you review the facts of this transaction and determine what the proper, contractual recourse should be." GX434.

This remained true after Mr. Turley left Somma in 2017 to start another food-supply company named Zephyr. It, too, was ultimately unsuccessful. But even during the high-pressure struggles of his new company in the midst of the COVID-19 pandemic, Mr. Turley demonstrated his unflagging commitment to comporting himself ethically. As William Dale Cullins writes, when the pandemic forced Mr. Turley's fledgling company to close, Mr. Turley still made sure Mr. Cullins was paid what he was he owed. Ex. C (William Dale Cullins). Jeb Joyce had the same experience. When Zephyr went out of business, Mr. Turley stuck to his principles of "mak[ing] sure he is doing things by the book" in the context of a business loan owed to a bank. Ex. D (Jeb Joyce). As Mr. Joyce describes, "[t]hroughout the process, Michael has told me repeatedly that he wanted to do the right thing and repay the bank." *Id.* This not only speaks to Mr. Turley's character, but also it underscores the fundamental flaw in the government's argument that Somma could (or should) have simply walked away from the debt that was owed to lawyers for work already performed for RMSCO. *E.g.*, Tr. 1638:5-22, 1698:9-11. Even if such conduct were legally permissible, it would have been wholly inconsistent with the way Mr. Turley conducted business.

Even after failing in his entrepreneurial efforts and while in the midst of the pandemic, Mr. Turley was able to continue his career in the food industry—this time, as the Director of Marketing at PIC North America, a pork producer. As described *infra*, Section II.C, Mr. Turley's subsequent

arrest and the publicity of this case caused immediate and lasting consequences in Mr. Turley's career.

### B. Mr. Turley's Defining Trait Is His Devotion as a Father

The character letters submitted on Mr. Turley's behalf from family members, friends, and colleagues all emphasize Mr. Turley's devotion as a father. Indeed, Mr. Turley's defining role is as a father to his two children: 25-year-old Alex and 9-year-old [redacted]. In Alex's own words:

> [My dad] has always devoted time to his kids and adapted his interests to theirs. Whether it was reading books to learn more about the sport I was playing so he could teach me (tennis did not come naturally to him) or buying an XBOX to play games with me while I stayed at my mom's house, my dad has consistently found ways to stay actively involved in my life. When I started baseball and floated from team to team, he eventually began his own team to teach kids how to play the game with respect and spend more time with me.
>
> The love my sister has for my dad is absolute. [redacted] is the biggest "daddy's girl" I have ever seen. She still gets quite jealous when we go to movies or Arkansas games that she is unable to attend, because she is missing time with him. She always wants to show him that she can land her new full gymnastics routine that she has been working on. Since her interest in gymnastics began, the garage has since turned into a home gymnastics gym with half the space dedicated to her own equipment. It has been remarkable to watch my dad learn everything he can about gymnastics to help [redacted] with her sport, the same way he always supported me.
>
> …
>
> During sentencing, all that I ask is for The Court to consider my sister. I have been blessed to have my dad raise me and transition to being my sounding board as I became an adult. While I still greatly need him in my life and operating as my sounding board, [redacted] needs him more and would be devastated. It is her turn for countless sports tournaments, impromptu coaching sessions, and to learn what respect looks like. She deserves the same upbringing I have been fortunate with and that requires my dad to be present.

Ex. B (Alex Turley).

Jill Turley, [redacted]'s mother and Mr. Turley's ex-wife, similarly details Mr. Turley's engagement in [redacted]'s life:

> [[redacted]] could not more epitomize a Daddy's girl. Michael is attentive and patient with her, and ensures that her life is full of love and happiness every day. He spends quality time with her, and she can feel how much her daddy loves her. Her favorite

> day is Saturday, because that is "Donut Day" with daddy and has been for most of her life.
>
> [redacted] participates in competitive gymnastics and recreational basketball, and Michael has never missed a single meet or game. He is engaged and involved in both her school and extracurricular activities. When [redacted]'s teachers express a need for the classroom, Michael is often the first to respond. He helps shuttle to practices and events, and, more than once, he has helped move heavy gymnastics equipment because the gym where [redacted] trains needed help.

Ex. A (Jill Turley). Dr. Eric Walker, a friend through church, says "Michael has been heavily involved in [his children's] upbringing," noting "father-daughter activities" with [redacted], "such as father-daughter dates and dances, allowing her to paint his nails, and dressing up for play dates." Ex. E (Eric Walker). He also discusses Alex, who "often consults his father in not only matters of business but frequently seeks his counsel on personal matters. I have seen Michael's efforts to unconditionally support Alex over the past several years." *Id.*

Jill writes that if Mr. Turley is incarcerated, [redacted] "will suffer a heartbreak that I cannot even fathom. . . . And I fear that Michael going away and her having to try to understand what is happening will change her as a person forever." Ex. A (Jill Turley). Family friends Chad and Kimberly Betts note [redacted]'s struggles when Mr. Turley traveled for work, "because she missed him so much. It always broke our hearts." Ex. F (Chad and Kimberley Betts). They, too, "are very concerned about how [Mr. Turley] being away from his children, in particular his young daughter [redacted], will affect their mental wellbeing." *Id.* This message is resounding across the letters submitted on Mr. Turley's behalf. *See, e.g.*, Ex. G (Cliff Layton) ("I know that it will devastate Jill and [redacted] financially and emotionally if Michael were to get jail time.").

Alex and Jill are aware of Mr. Turley's case and were present for much of the trial. But [redacted], to this point, is utterly unaware. Mr. Turley has made every effort to maintain a sense of normalcy and stability for [redacted]. For the last three years, Mr. Turley has been on supervised release and has never had a violation, with one recent exception. Last month, Mr. Turley was able

to find inexpensive, last-minute flights to Orlando. Recognizing this could be their last family vacation for some time, Mr. Turley decided to take [redacted] and Alex to Disneyworld for the Fourth of July holiday weekend. Mr. Turley informed his current probation officer, Matthew Merritt, of the Disneyworld travel plans the day before leaving. Only after Mr. Turley was already in Florida with his children did he learn that had failed to comply with a requirement that he provide two weeks' notice to the U.S.P.O. and receive affirmative approval before traveling. Mr. Turley recalled a modification to his conditions of release to require only notice (and not approval) of travel but did not recall that this modification applied only to work-related travel. ECF No. 37, Minute Order dated June 2, 2022 (granting the same). He did not and does not remember a requirement that he provide two weeks' notice for travel within the United States, and none of the conditions of release on the docket include that requirement. *See* ECF Nos. 18, 37, 58; Minute Orders dated June 2, 2022, September 7, 2022. And he recalled that his original probation officer, Rachel Roisen-Avant, simply required advance notice of out-of-state travel. Mr. Turley therefore believed that by providing notice of the Disneyworld trip to Officer Merritt, he was complying with his conditions of release. While the U.S.P.O. found him in violation of his terms of release, it did not request any action from the Court.

### C. Mr. Turley's Steadfast Perseverance in the Face of Countless Collateral Consequences

Before Mr. Turley's arrest, he was able to support his family in a nice neighborhood of Fayetteville, Arkansas with top-notch public schools for [redacted], who started kindergarten in 2020. That all ended on September 29, 2021. On that day, an FBI agent whom Mr. Turley had previously invited into his home, brought a team of highly armed law enforcement officers to Mr. Turley's home, where they established a perimeter around the property. ECF No. 39. Mr. Turley was arrested and kept in shackles for the rest of the day. *Id.* He was kept in custody for a total of three

days, including one day after he was ordered released on bail conditions that Mr. Turley satisfied. *Id.* The government issued a press release, accompanied by a criminal complaint that contained a number of significant misstatements. Mr. Turley's employer at the time, PIC North America, was reluctantly forced to fire him as a result of the negative publicity.

Mr. Turley had a predictably difficult time finding another job while under indictment. He searched tirelessly for a new job for nearly a year, before finally securing a position as Director of Marketing at a company outside of the food industry. He was transparent about the charges against him to his would-be employer, which decided to hire Mr. Turley despite the ongoing legal proceedings. But just days before his start date, the company rescinded the job offer, again due to the negative publicity of this case. Despite his best efforts and flexibility, Mr. Turley remained unemployed.

Finally, a local fence, gate, and rail installation company, Superior Fence & Rail of Arkansas, took a chance on Mr. Turley and hired him as General Manager. Although this was far afield from his area of expertise and paid a fraction of his salary from previous employers, Mr. Turley applied himself with the same diligence, effort, and commitment as he had in every other job throughout his career. Mr. Turley quickly became indispensable to the company. As one his bosses, Calvin Smith, describes in his letter to the Court:

> Michael is an outstanding employee whose dedication and work ethic are second to none. He has shown absolute integrity and trustworthiness in all professional dealings. His leadership skills have been instrumental in driving our business forward, and he is highly respected by his colleagues and subordinates alike. Michael's ability to inspire and motivate those around him is a testament to his exceptional leadership capabilities.

Ex. H (Calvin Smith). His other boss, Alex Baldwin, explained that Mr. Turley "is routinely the hardest worker in our company, sometimes working 60-70hr weeks. We think so much of his

morals, character and integrity we gave him full financial authority for our company." Ex. I (Alex Baldwin).

Remarkably, even after the convictions in this case, the company did not fire Mr. Turley. When contemplating the possibility that Mr. Turley could be sentenced to a period of incarceration, Mr. Baldwin notes: "Losing Michael would cause a major disruption for our company, employees and customers." *Id.* Similarly, Mr. Smith writes:

> The prospect of Michael serving time in prison is one that fills us with great concern. It would not only be a severe personal hardship for his family but also a significant impact on our business and employees. Michael's absence would create a void that would be difficult, if not impossible, to fill. His leadership, integrity, and commitment are integral to the continued success and moral of our organization.

Ex. H (Calvin Smith).

Despite being gainfully employed, Mr. Turley's financial position has been devastated by this case. All of his savings have gone to pay the cost of his legal defense. He was forced to sell the home in which [redacted] had lived since birth, and he and Jill moved to two less-expensive rentals.

Shortly after the trial concluded, Jill filed for divorce. Not only did Mr. Turley lose his partner and source of emotional support, but he also lost much of his time with [redacted]. Just as he had adapted to the major changes in his professional circumstances, Mr. Turley adapted to this major life change as well. Mr. Turley maintains a great relationship with Jill, that Jill explains is characterized by "strong mutual respect and caring for one another, as well as a solid commitment to co-parenting [[redacted]] to ensure she grows up strong, happy, and healthy." Ex. A (Jill Turley). Michael has 50% custody of [redacted] and made sure to find a home "right around the corner" from Jill, *id.*, so he can see [redacted] every day, even if only to kiss her goodnight.

Despite all the challenges that have resulted from these legal proceedings, Mr. Turley continues to put one foot in front of the other every single day. Dr. Walker explains that "Michael has also been involved in church activities and personal growth seminars, demonstrating his commitment to self-improvement not only personally but also spiritually. These efforts showcase his desire to better himself and contribute positively to the community around him." Ex. E (Eric Walker).

## III. APPROPRIATE SENTENCE

The Supreme Court has recognized that sentencing judges exercise "wide discretion" in the types of evidence they may consider when imposing sentence. *See, e.g*., *Pepper v. United States*, 562 U.S. 476, 480, 488 (2011). Although application of the advisory Sentencing Guidelines is one step in the analysis, *see Booker*, 543 U.S. at 264–66, the Court "may not presume that the Guideline range is reasonable," *Gall v. United* States, 552 U.S. 38, 39 (2007). In fact, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). The Court must therefore "make an individualized assessment based on the facts presented" considering factors identified in 18 U.S.C. § 3533(a), *Gall*, 552 U.S. at 50, to determine a sentence "sufficient, but not greater than necessary," to accomplish the goals of sentencing. § 3533(a).

The goals of sentencing are set forth in § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In addition to these goals of sentencing, § 3553(a) directs the sentencing court to consider the following, non-exclusive factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentences available;" (3) "the sentencing range established [under the Sentencing Guidelines];" and (4) "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §§ 3553(a)(1), (3), (4), and (7). A careful balancing of the § 3553(a) factors demonstrates that, in this case, the goals of sentencing can be accomplished with a non-carceral sentence.

### A. The Court Should Depart from the Guidelines Range Because It Overstates the Seriousness of the Offense and Because Mr. Turley Has No Prior Criminal History.

Mr. Turley's lack of criminal history and any previous contact with the criminal justice system support a downward departure. Recent changes to the U.S. Sentencing Guidelines recognize that courts should give great weight to a defendant's lack of criminal history when fashioning a sentence. The updated Guidelines account for the fact "that offenders with zero criminal history points have considerably lower recidivism rates than other offenders." *See* 88 Fed. Reg. 28254, 28273 (May 3, 2023) (citing U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* (Sept. 30, 2021), https://www.ussc.gov/research/ research-reports/recidivism-federaloffenders-released-2010). Accordingly, as of November 1, 2023, certain "zero-point offenders" receive a two-level decrease pursuant to U.S.S.G. § 4C1.1.[1] Furthermore, Application Note 10(B) to U.S.S.G. § 5C1.1 now provides that:

> A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range

[1] "[W]hen the [United States Sentencing] Commission adopts new, lower Guidelines amendments, those amendments become effective to offenders who committed an offense prior to the adoption of the new amendments but are sentenced thereafter." *Dorsey v. United States*, 567 U.S. 260, 275 (2012).

> overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense.

U.S.P.O. agrees that Mr. Turley is entitled to a two-level adjustment under § 4C1.1. PSR ¶ 101.

Mr. Turley's position that the Guidelines range overstates the seriousness of the offense is set forth in the Defendants' joint brief, ECF No. 201, which he incorporates by reference here. In recognition of "the calls for leniency which underpin the amendments to the Guidelines," Mr. Turley asks the Court to grant a further reduction from the Guidelines and consider a non-carceral sentence. *See United States v. Paredes*, No. 15-CR-582 (WFK), 2023 WL 8096922, at *6, *7 (E.D.N.Y. Nov. 21, 2023) (ruling that a sentence of probation "is consistent with, and is sufficient but not greater than necessary to accomplish, the purposes of § 3553(a)(2)").

**B. A Probationary Sentence Is Supported by the § 3553(a) Factors and Serves the Purposes of Sentencing**

After calculating the applicable Guidelines range, the Court must exercise its "substantial discretion" to fashion a sentence that comports with the factors prescribed by 18 U.S.C. § 3553(a). As applied to Mr. Turley, the § 3553(a) factors support a non-carceral sentence.

1. <u>Mr. Turley's history and characteristics.</u>

Mr. Turley is far more than the events that led to the jury's verdict. He is kind soul who cares deeply about those around him and those he does not even know, as evidenced by his lifelong commitment to volunteer work. Mr. Turley is an exemplary father to his children and his importance in their lives cannot be overstated. As detailed above, Mr. Turley's conviction in this case stands in stark contrast to an otherwise unblemished life.

Accounts of Mr. Turley's innumerable acts of kindness and compassion fill the letters of his friends, family, and colleagues. These letters tell many stories of the man Mr. Turley is. Most importantly, they tell the story of a father whose dedication to and love for his children is clear to

everyone he meets. Moreover, the letters submitted on behalf of Mr. Turley are suffused with concern for nine-year-old [redacted] if her father is sent to prison.

Mr. Turley's essential role in [redacted]'s life impacts Jill as well, with whom Mr. Turley "share[s] in all child care responsibilities" and "split[s] expenses 50/50." Ex. A (Jill Turley). Jill writes: "Michael being incarcerated would cause both life and financial hardship" for her, as she would become the primary caregiver. *Id.* This prediction is supported by studies that have found that "[i]n the wake of parental incarceration, family members must deal with the sequela of traumatic separation, loneliness, stigma; how to explain the separation to children, strained parenting, reduced family income, unstable childcare arrangements, and home and school instability and transitions." *United States v. Aguilar*, 133 F. Supp. 3d 468, 477 (E.D.N.Y. 2015) (quoting Kalina M. Brabeck, M. Brinton Lykes & Cristina Hunter, *The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 Am. J. of Orthopsychiatry 496, 500 (2014)).

Admittedly, the mere fact that a prison term for Mr. Turley would impact an innocent child is not unusual: "Incarceration of a parent normally causes major negative economic, social, and psychological consequences to the child, and may have life-long [adverse] repercussions." *United States v. G.L.*, 305 F.R.D. 47, 50 (E.D.N.Y. 2015) (quoting Michal Gilad, *The Young and the Helpless: Re–Defining the Term "Child Victim of Crime,"* 32 (U. Penn. Law School, Public Law Research Paper No. 14–23 (2014))). But Courts can and have granted leniency in sentencing in order to preserve the parent-child relationship where the parent is particularly involved in their child's life. *See United States v. Davis*, No. 07 CR. 727 (HB), 2008 WL 2329290, at *6, *2-3 (S.D.N.Y. June 5, 2008) (sentencing defendant to time served, supervised release, and community service due largely to his commitment as a husband and father, and his "demonstrated motivation

to stay out of trouble").

Moreover, Mr. Turley's lifelong commitment to helping others militates in favor of a below-Guidelines sentence. In *United States v. Rioux*, the Second Circuit affirmed the district court's decision to grant a downward departure based, in part, on "charitable and civic good deeds." 97 F.3d 648, 663 (2d Cir. 1996). The panel noted that "[w]hile many of Rioux's public acts of charity are not worthy of commendation, he unquestionably has participated to a large degree in legitimate fund raising efforts. Of particular moment are Rioux's efforts to raise money for the Kidney Foundation," which made the downward departure appropriate. *Id.* As noted *supra*, Section II.A, Mr. Turley spent decades incorporating his passion for children's wellness into his life's work and routine volunteer efforts. He made considerable impacts in these efforts—including in this very District at Edward R. Murrow High School—and, through his leadership position at Tyson, recruited others to volunteer as well. Mr. Turley respectfully requests that the Court take his demonstrated commitment to bettering the lives of others into account when deciding his sentence.

Despite the life-altering consequences of his arrest and, later, his conviction, Mr. Turley persevered and adapted in order to maintain his ability to support the people he loves. He found a stable job, where he earned the trust of everyone around him and where he makes an honest living. And following the post-conviction separation and divorce, he and his ex-wife quickly established a strong co-parenting relationship and arrangement for [redacted]. Mr. Turley's commitment and ability to live a lawful life in the face of these challenges was far from a given, and it is another basis for lenience in sentencing. *See United States v. Hawkins*, 380 F. Supp. 2d 143, 146 (E.D.N.Y. 2005), *aff'd*, 228 Fed. Appx. 107 (2d Cir. 2007) (granting 5-level downward departure in light of favorable reports on "defendant's work, home life, and other indicia of rehabilitation"); *G.L.*, 305

F.R.D. at 52 (sentencing defendant with an offense level of 21 and criminal history category of I to one day of time served with a supervised release term of 5 years, due to factors including her maintenance of a lawful life and the potential effect of incarceration on her daughter).

As the U.S. Supreme Court has said, "the punishment should fit the offender and not merely the crime." *Williams v. People of N.Y.,* 337 U.S. 241, 247 (1949). Mr. Turley's personal characteristics, outlined throughout this submission and its accompanying letters, reflect a man worthy of lenience in sentencing. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").

2. <u>The public is not at risk of further crimes by Mr. Turley.</u>

Mr. Turley does not need to be imprisoned to protect the public from criminal conduct by him. This case marks the only contact with the criminal justice system in Mr. Turley's life, and the crimes of conviction here ended over seven years ago, during which period of time Mr. Turley was not incarcerated and committed no crimes.

Mr. Turley's objective characteristics—his age, complete lack of prior criminal history, history of stable employment, and strong family ties— also make him highly unlikely to recidivate. The United States Sentencing Commission has concluded that individuals "with zero points and no prior contact with the criminal justice system" have the lowest recidivism rate across all other categories of offenders. U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 6 (Mar. 9, 2017), https://www.ussc.gov/sites/default/files/

pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf. Age is another key predictor of recidivism. Mr. Turley is 54 years old. The Commission found that "[t]he recidivism rate of older offenders (21.3%) was less than half that of offenders under the age of 50 (53.4%)." U.S. Sent'g Comm'n, *Older Offenders in the Federal System* 5 (July 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/ 2022/20220726_Older-Offenders.pdf. Courts in this Circuit often "decline to impose Guidelines sentences on defendants who . . . were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Ruiz*, No. 04CR.1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (citing, among others, *United States v. Carmona-Rodriquez*, No. 04 Cr. 667RWS, 2005 WL 840464, at *5 (S.D.N.Y. Apr. 11, 2005)).

Strong family ties are linked to low recidivism rates. Shirley R. Klein *et al., Inmate Family Functioning,* 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99–100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."). Stable employment is another indicator that someone is less likely to recidivate. U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (May 2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf. Finally, the Commission has concluded: "Possible sentencing reductions for 'first offenders' are supported by the recidivism data and would recognize their lower re-offending rates." *Id.* at 15; *see also id.* at 13 ("[O]ffenders are most likely to recidivate (25.6%) when their sentence is a straight prison sentence. . . . Of those offenders sentenced to a probation only sentence, 15.1 percent recidivate.").

3. Mr. Turley has already suffered substantial punishment.

Mr. Turley has already been severely punished for the conduct that led to his conviction. As outlined above, Mr. Turley has lost his marriage, fifty percent of his time with his daughter, his home, his financial security, his career, and his reputation. Since 2020, news of Mr. Turley's indictment—and now conviction—has been widely available to anyone who searched his name on Google and will continue to be for the rest of his life. His standing in the community has plummeted, and he lost multiple jobs as a result. He had to sell his family home to pay for defense costs. His marriage fell apart. His professional status and earning potential have suffered immensely. Numerous family experiences have been disrupted. Each of these personal and professional consequences has been punishment in and of itself. For Mr. Turley, whose identity revolves around being a good father, it devastates him that his circumstances have caused his family pain.

The life-altering impact of incarceration cannot be overstated. As the Second Circuit has reflected:

> Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual. They also have consequences both for society which bears the direct and indirect costs of incarceration and for the administration of justice which must be at its best when, as here, the stakes are at their highest.

*United States v. Jenkins,* 854 F.3d 181, 193 (2d Cir. 2017). Moreover, "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons." *United States v. Nesbeth,* 188 F. Supp. 3d 179, 184 (E.D.N.Y. 2016). 1,200 of those collateral consequences are imposed by federal law. *Id.* at 185. Mr. Turley has already suffered collateral consequences from indictment, arrest, and conviction. Even if this Court were to sentence Mr. Turley to not a single day of incarceration, his punishment will have already been severe.

4. The need to avoid unwarranted disparities under § 3553(a)(6)

18 U.S.C. 3553(a)(6) instructs courts to consider the need to "avoid unwarranted sentence disparities" between the defendant and similarly situated defendants. As set forth in Part I of Mr. Twomey's sentencing submission and Part V of Mr. Goldstein's sentencing submission, which Mr. Turley adopts by reference, courts in the Second Circuit routinely sentence defendants in non-violent crimes to sentences significantly below the low end of the applicable Guidelines range, a recognition that a strict application of the Guidelines in these circumstances would result in a sentence much greater than what is necessary to accomplish the goals of sentencing. This is particularly true in this case, where the evidence at trial established that the Somma defendants were offering a solution to a very real, preexisting, need of SchoolFood.

5. A sentence of probation is sufficient to reflect the seriousness of the offense and provide just punishment to Mr. Turley as an individual.

Taken together, these factors make a downward variance especially appropriate here. As discussed *supra*, Section III.B.1, courts have granted downward departures based on individualized considerations like those present in this case. In *United States v. Gaind*, for example, the district court departed downward from the Guidelines where "the destruction of the defendant's business," by itself, satisfied some of the goals of sentencing. 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994). The court reasoned:

> Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence. Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior.

*Id.*

A probationary sentence that reflects the seriousness of the offense, the mitigating

circumstances, Mr. Turley's background, and the impact on his loved ones and community if he were incarcerated, will serve the purposes of sentencing. In particular, such a sentence will be consistent with the need for general deterrence. Anyone who knows the price Mr. Turley has paid will be less likely to commit a crime.

If the Court is concerned about the sufficiency of a probationary sentence to accomplish the goals of sentencing, a period of home detention as a condition of probation would address that concern and still allow Mr. Turley to remain a presence in his daughter's life and fulfill his job responsibilities at Superior Fence & Rail of Arkansas.

## CONCLUSION

The Court must impose a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing, 18 U.S.C. § 3553(a), and one that considers Mr. Turley "as an individual." *Pepper*, 562 U.S. at 487. The sum of Michael Turley's life and character, we submit, calls for lenience. Mr. Turley respectfully asks the Court to order probation rather than incarceration. A sentence of incarceration, because it would be "greater than necessary" to accomplish the purposes of sentencing, would be inconsistent with § 3553(a)'s parsimony principle.

Dated: August 2, 2024 Respectfully submitted,

ZUCKERMAN SPAEDER LLP
By: *_/s/ Aitan D. Goelman_*
Daniel A. Braun (admitted *pro hac vice*)
Aitan D. Goelman
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: 202.778.1800
Fax: 202.822.8106
agoelman@zuckerman.com
dbraun@zuckerman.com

Leila Bijan
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: 212.704.9600

Fax: 212.704.4256
lbijan@zuckerman.com

*Attorneys for Michael Turley*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024 a true and correct copy of the foregoing was filed with the Court using the Court's CM/ECF system and served upon all parties of record.

/s/ Aitan D. Goelman